718 P.2d 1200

**J.R. SIMPLOT COMPANY, Employer Account #033175–0, Employer-Appellant,**

v.

**STATE of Idaho, DEPARTMENT OF EMPLOYMENT, Respondent.**

**No. 15849.**

Supreme Court of Idaho.

April 18, 1986.

James T. Hungelmann, Joseph D. McCollum, Jr., and Kenneth C. Howell, (argued), Boise, for employer-appellant.

Jim Jones, Atty. Gen., and Roger T. Martindale, Deputy Atty. Gen. (argued), Boise, for respondent.

SHEPARD, Justice.

This is an appeal from an order of the Industrial Commission that potato loaders are employees of Simplot and covered under the provisions of the Employment Security Law, and hence Simplot should be assessed unemployment insurance compensation taxes. We reverse.

For approximately ten years Simplot has contracted with approximately 18 teams of potato loaders in Idaho, Oregon, Nevada and Washington to load potatoes from cellars in remote locations into trucks for transportation to processing plants. One Maldonado had so contracted with Simplot for the 1982–83 loading season. At the end of that season Maldonado filed a claim for unemployment benefits which precipitated the instant controversy. The Department of Employment initially denied Maldonado any benefits, but an appeals examiner later reversed that decision. Simplot appealed to the Industrial Commission which assigned the case to a referee who heard the case *de novo*. The referee made findings of fact, conclusions of law, and recommended that the decision awarding Maldonado benefits be affirmed and that the potato loaders be held to be employees, covered by the Employment Security Law. The commission adopted the decision of the referee.

We note initially that the testimony before the referee was without controversy. Maldonado did not appear and did not testify before the referee. Only two witnesses testified, both on behalf of Simplot, one being the fleet trucking manager for Simplot and the second, a potato loader.

Simplot contracts for the purchase of potatoes from growers in Oregon, Washington, Idaho and Nevada. When harvested, the potatoes are loaded into cellars in remote locations in those states. The cellars may be owned by Simplot, the farmer, or others. The cellars are ordinarily 100 feet in width and 500 feet in length. The cellars contain a sophisticated refrigeration system to control the temperature of the potatoes whereby air is distributed through pipes approximately two feet in diameter over which the potatoes are piled. From these cellars the potatoes are loaded into trucks owned by Simplot or independent contractors, and transported various distances to Simplot processing plants.

Prior to the contract arrangement Simplot hired employees to do the potato loading. Those employees were paid not only wages but an expense account for meals and lodging, and Simplot furnished all of the equipment, including a pickup truck. That employee relationship was terminated, in part because of the difficulty of supervision of the employees at the remote locations. Approximately ten years ago Simplot began contracting the potato loading activity on a yearly basis, with the contracts usually signed in the fall season. A contract provides for payment on the basis of numbers of trucks loaded, and that rate is usually negotiated between the group of contract loaders and Simplot, in the fall. No withholding is done by Simplot for any purpose, and the potato loaders pay their own self-employment taxes. The potato loaders are required by contract to employ at least one other person, and may and do employ others at times, depending upon the severity of the work schedule.

Simplot furnishes two pieces of equipment, a loader and a "hogger," valued at approximately $18,000.00. The potato loader is required to furnish his own pickup truck which is used to transport the loading equipment from site to site, which the testimony indicated was valued at approximately $18,000.00. The loaders also furnish their own equipment valued at up to $1,500.00 for the repair and maintenance of the loading equipment and the refrigeration equipment in the cellars. The loaders also furnish their own housing at the remote locations, which usually consists of

a trailer or a recreation vehicle. The potato loaders ordinarily work a 10–12 hour day, five days a week, and sometimes the scheduling requires them to work weekends also. It is at such times that more than the one employee of the loader may be necessary. The contract specifies the method to be used in the loading of potatoes, requires that the loader keep the cellar in a clean condition free of dirt, requires that truck traffic be directed by the loaders, and regulates the persons allowed in the cellar.

Because the processing plants must have a controlled flow of delivered potatoes, the rotation of truck loads between the cellars and the processing plant is important, and hence the loaders call in to the processing plant to learn the times that the trucks will begin arriving at the cellar. The loaders' working time usually starts at 11:00 o'clock at night, or later.

The uncontradicted testimony indicated that during the time that Simplot considered the potato loaders as employees, there were problems of supervision at the remote locations of the cellars and that those problems were one of the reasons, along with costs, for the change of potato loaders to an independent contract status:

"Q. Now, how does the contract situation resolve the supervision problem which you referred to?

"A. They do their own thing. We just tell them how many loads we want loaded daily, and they are there to do it at that time, and who the truckers are that will be loaded.

. . . .

"Q. Doesn't the contract also require a proper handling of potatoes?

"A. It does.

"Q. How do we check that?

"A. Well, we can tell by bruises, torn-up potatoes; we can physically inspect the site as far as dinged-up pipes, [refrigeration equipment in the cellar] how clean the location is that they are working in and things of that nature.

"Q. How frequent are these inspections?

"A. Oh, probably once every month; once every two months. Something of that nature.

"Q. Other than these periodic inspections, there is no on-site inspection by J.R. Simplot employees?

"A. None whatsoever."

(Tr., Vol. 1, pp. 13–14)

The undisputed testimony indicated that Simplot was only concerned with the end result accomplished by the potato loaders, *i.e.,* that the potatoes were not damaged in the loading process and arrived at the plant in useable condition, and that any damage that might occur to the cellars was repaired. Although other Simplot personnel did occasionally visit the work site, those persons were concerned only with the condition of the potatoes in the cellar, and not with the work performed by the potato loaders.

As above indicated, there is no dispute as to the evidence, and the only evidence presented before the referee was that of two Simplot witnesses. Neither Maldonado nor the Department of Employment presented any testimony before the referee. Hence, there is no question as to the facts. Rather, it is the referee's application of the law to those facts, and his conclusion that the seasonal potato loaders are employees of Simplot, which presents the only issue.

I.C. § 72–1316 defines "covered employment" in pertinent part as follows:

(d) Services performed by an individual for remuneration shall, for the purposes of the Employment Security Law, be covered employment unless it is shown:

(1) that the worker is free from control or direction in the performance of his work under his contract of services; and

(2) that the worker is engaged in an independently established trade, occupation, profession, or business.

The right to control test was discussed in *Department of Employment v. Bake Young Realty*, 98 Idaho 182, 560 P.2d 504 (1977):

"The general test of whether the right to control is sufficient to give rise to the relationship of employer and employee is whether or not the control extends to '... the details of the work, the manner, method or mode of doing it, the means by which it is to be accomplished, or, specifically, the details, manner, means or method of doing the work, as contrasted with the result thereof.'" (Citations omitted.) 98 Idaho at 184, 560 P.2d at 506.

■ The evidence before the commission indicated that the potato loaders worked in remote locations without any direct supervision. While Simplot directed the specific times for loading, that determination was only pointed toward the end result of potatoes arriving at the processing plant when needed. While specific loading procedures were set forth in the contract, again those practices were merely pointed toward the end result of the potatoes arriving at the processing plant in a useable condition.

As to the requirement of engaging in an independent trade or business, the following factors are to be considered: (1) whether the worker has the authority to hire subordinates; (2) whether the worker owns major items of equipment; and (3) whether either party would be liable to the other upon peremptory termination of the business relationship. *Hill v. State, Dept. of Employment,* 108 Idaho 583, 701 P.2d 203 (1985); *Larsen v. State, Dept. of Employment,* 106 Idaho 382, 679 P.2d 659 (1984); *Dept. of Employment v. Brown Bros. Const.,* 100 Idaho 479, 600 P.2d 783 (1979).

Here it is clear that potato loaders had authority to, and did, hire employees, and the sole responsibility for the compensation of those employees was that of the loader. Simplot exercised no control over the selection of the employees, nor how many employees the loader might hire. Likewise, the evidence is clear that while Simplot supplied two major pieces of the equipment, the potato loaders supplied all tools necessary for the maintenance and/or repair of the equipment, together with welding equipment and torches. The only testimony by a potato loader indicated that he

furnished an $18,000.00 pickup truck for use on the jobs, and a $28,000.00 mobile home which was required to provide housing at the remote location.

In *Department of Employment v. Bake Young Realty,* 98 Idaho 182, 560 P.2d 504 (1977), we held that the furnishing of equipment test:

"is too narrow a reading of *Swayne v. Department of Employment,* 93 Idaho 101, 456 P.2d 268 (1969), prompted perhaps by the test's origin in *National Trailer [Convoy, Inc. v. Employment Security Agency,* 83 Idaho 247, 251, 360 P.2d 994, 996 (1961)], a case involving truckers who owned their own rigs. The point is not whether the salesman owns major pieces of tangible equipment for the business, but whether he incurs substantial out-of-pocket professional expenses which are not reimbursed." 98 Idaho at 187, 560 P.2d at 509.

Here, the contract loaders are required to, and do, provide their own food, lodging and fuel at the remote location.

■ We hold that as to the third factor, *i.e.,* whether either party will be liable to the other for a peremptory termination of the business relationship, the referee-commission unduly emphasized the fact that the contract provided that Simplot had the right to cancel the agreement at any time without prior notice and without liability beyond its obligation to pay for work which had already been performed. As was well stated by Bakes, J., specially concurring in *Department of Employment v. Brown Bros. Const.,* 100 Idaho 479, 600 P.2d 783 (1979), "There is no fixed rule stating that an employment relationship is terminable at will, but an independent contractual relationship cannot be terminated unilaterally without a breach of contract. In either case, it depends upon the agreement of the parties and they can agree one way or the other." Undue emphasis has been placed upon the factor of peremptory termination of business relationships. While that factor may in the past have shed some light, in these times it has become less and less determinative. An employee relation-

ship may no longer be terminable at the sole will of the employer. Likewise, in an independent contractor relationship a contract may commonly provide for a unilateral termination of the contract with no liability except for work already performed. Hence, we hold that the peremptory termination of a relationship continues to be only one of many factors to be considered, and in any case is of diminished validity standing by itself.

In sum, we hold that the conclusions drawn from the uncontroverted evidence are erroneous and are reversed. Costs to appellant.

DONALDSON, C.J., and BAKES, J., concur.

BAKES, Justice, concurring specially:

I concur in the majority opinion because I believe the Department of Employment and the Industrial Commission continue to labor under two misapprehensions of law. First, the Department of Employment and the Industrial Commission cannot dispose of a contract provision whereby the parties have agreed in their contract that their relationship is that of independent contractor rather than employer-employee, by merely stating that "the existence of such a contract does not necessarily control a decision," as they have done in this case. Conclusion of Law IV. I continue to believe, as stated in my dissenting opinion in *Burdick v. Thornton*, 109 Idaho 869, 712 P.2d 570 (1985), that the preceding quotation from Conclusion of Law IV "reflects a basic evidentiary misunderstanding of the important role which the agreement between the parties plays in the determination of whether or not the relationship is employer-employee or principal and independent contractor." 109 Idaho at 875, 712 P.2d at 576. I continue to be of the opinion that "the terms of the parties' contract, while not conclusive, represent the most important evidence to be considered in determining the intent of the parties. This becomes particularly obvious when one carefully considers the right to control test used to determine whether an individual is an independent contractor. The right to control test requires an examination of whether the *contract gives*, or the employer assumes, the right to control the time, manner and method of executing the work, as distinguished from the right merely to require certain definite results in conformity to the contract." 109 Idaho at 875, 712 P.2d at 576. In this case the decision of the commission again fails to give the parties' contract the consideration it warrants.

The second misapplication of law is the commission's conclusion that if the contract may be terminated at any time without any liability on the part of the terminating party it is evidence of right to control the work and thus an employer-employee relationship. The commission cited the department's administrative rule, No. 09.35.112 and –.113, which apparently so provides. The commission then concluded that "Simplot also has the right to control the work through the contracts since it may terminate the contract at will at any time without any liability whatsoever."

However, the fact that the contract may be terminated at will is inconclusive evidence one way or the other concerning whether it is an independent contractual relationship or an employment relationship. *Dept. of Employment v. Brown Bros. Constr.*, 100 Idaho 479, 600 P.2d 783 (1979) (Bakes, J., concurring specially). According to a January, 1986, article in the National Law Journal, more than two-thirds of the American jurisdictions have now abandoned the employment-at-will doctrine upon which the department's rule is premised, and have put some limitations on an employer's general right to fire an employee without incurring any liability. If those figures are accurate, and the information was taken from a December, 1985, update of a book entitled "Employee Dismissal Law and Practice," by Professor Henry H. Perritt, Jr., Wylie & Sons, Inc., then the ability to dismiss without incurring any liability may well be better evidence of an independent contractual status than an employer-employee status. In any event, I believe that the right to terminate without

incurring liability is insignificant evidence that the relationship is that of employer-employee, rather than independent contractor.

BISTLINE, Justice, dissenting.

The question before us is whether the services performed by the claimant, Maldonado, and other persons working for Simplot, constitutes "covered employment" under I.C. § 72–1316. Section 72–1316(d) provides in part:

> Services performed by an individual for remuneration shall, for the purposes of the employment security law, be covered employment:
> (1) *Unless* it is shown:
> (A) That the worker has been and will continue to be free from control or direction in the performance of his work, both under his contract of service and in fact, *and*
> (B) That the worker is engaged in an independently established trade, occupation, profession, or business. . . .

(Emphasis added.)

Thus, I.C. § 72–1316(d) creates a two-part test for a worker's exemption as an independent contractor and establishes a presumption that a worker is an employee unless the prospective employer can show that both parts of the test are met.

In interpreting subsection (A) of § 72–1316(d)(1), this Court has stated that the general test regarding the right to control is whether the control extends to "the details of the work, the manner, method, or mode of doing it, the means by which it is to be accomplished, or, specifically, the details, manner, means or method of doing the work, as contrasted with the result thereof." *Department of Employment v. Bake Young Realty*, 98 Idaho 182, 184, 560 P.2d 504, 506 (1977), *quoting Merrill v. Duffy Reed Construction Co.*, 82 Idaho 410, 415, 353 P.2d 657, 660 (1960). In *Totusek v. Department of Employment*, 96 Idaho 699, 701–02, 535 P.2d 672, 674–75 (1975), the Supreme Court also emphasized that the *employer* must not only show a worker to be free from actual control but

also from the "right to control." Thus, in this case, the mere "right" to control workers, even were it to be totally unexercised, will defeat Simplot's claim of independent contractor status.

All of the facts and circumstances in individual cases should be examined, and a number of considerations should be weighed in determining whether a worker is engaged in an independently established trade or business as referred to in I.C. § 72–1316(d)(1)(B). *Larsen v. State of Idaho, Department of Employment*, 106 Idaho 382, 384, 679 P.2d 659, 661 (1984). These considerations include: "(1) whether the worker had authority to hire subordinates; (2) whether the worker owned major items of equipment; and (3) whether either party would be liable to the other for a peremptory termination of the business relationship." *Department of Employment v. Brown Brothers Construction*, 100 Idaho 479, 481–82, 600 P.2d 783, 785–86. They also include various other factors as summarized in *Larsen.*

Finally, the burden of proof is clearly upon the *employer* claiming exemption to show that the workers are not employees. *Totusek, supra,* 96 Idaho at 702, 535 P.2d at 675. Furthermore, determination of whether an injured party is an independent contractor or an employee is a *factual determination* to be made from full consideration of the facts and circumstances established by the evidence. *Burdick v. Thornton,* 109 Idaho 869, 712 P.2d 570, 572 (1985). Thus, this Court is *limited* to determining questions of law and "whether findings of fact by the Industrial Commission are supported by substantial and competent evidence in the record." *Booth v. City of Burley,* 99 Idaho 229, 232, 580 P.2d 75, 78 (1978). If so supported, said findings will not be disturbed by the Supreme Court, even though the evidence is conflicting. *Hutchinson v. J.R. Simplot Co.,* 98 Idaho 346, 347, 563 P.2d 404, 405 (1977). Therefore, Simplot here must do more than simply demonstrate that the evidence might support the finding that the test of an independent contractor relationship un-

der I.C. § 72–1316(d) has been met. Simplot *must* demonstrate that the Industrial Commission's findings regarding *both* the "control" and "independent trade or business" tests are *not* supported by substantial and competent evidence.

When the statutory requirements, as interpreted by case and regulator authority are considered in the light of this burden of proof and applied to the facts of this case, it is clear that Maldonado and the other workers providing services for Simplot are employees rather than independent contractors, and that there is substantial and competent evidence in the record to support the decision of the Industrial Commission.

## II.

Although Simplot denies control of the workers and even suggests that there is no evidence whatsoever to demonstrate control, the overwhelming weight of the evidence leads to an opposite conclusion. The majority's decision ignores considerable evidence, which was substantial and competent. Jerry Davis, currently fleet manager for Simplot, testified before the appeals examiner that Simplot officials told the workers *how many* loads to load, *what time of day* to load them, and *how fast* they need to be loaded. He also stated that workers are required to sign an agreement which states the procedure for potato loading and that Simplot officials have representatives check once a week or so to see if the work is being done as specified in the contract. Davis further testified that Simplot officials would inspect from time to time to see whether or not there were potatoes that were being scattered around the storage location and not properly picked up or damaged.

Davis also testified that Simplot officials inspect the sites approximately once a month to see whether or not equipment is being damaged and whether the various sites are clean. He also said that Simplot expected the workers to observe the requirements in the "contract" regarding the positioning of loading equipment, also adding that Simplot officials determine the workers' starting time for work each day.

Thus, all of this testimony is extremely probative of *actual control over the method and details of performing the work, and not just control over the end result.* Simplot is dictating *when* to commence work, *how fast* it is to be completed, and *how* it is to be done. Dictating how the loading equipment is to be positioned is nothing less than controlling the means, method or manner of performing the work.

*Even if all of the evidence discussed above were lacking, the purported "contract" itself unmistakably in and of itself is probative of Simplot's control over the details, manner and method of performing the work.* The contract states that the workers shall perform certain services as specified in a designated attachment. The attachment dictates the following details of loading: how soon the crew should be at the cellar prior to loading time; the frequency of cleanup; the proper maintenance of the equipment; that crew members will help truck drivers back into the cellars using a flashlight; that there will be no loading over the side of the trucks; that the boom will be in back of the truck and as low as possible, and that the tailboard will be removed; that "belly dump" trucks should be loaded with turned-down nose pilers only; and that "belly dump" trucks that have to be loaded over the side must be positioned so that the loading is started in the corner of the trailer. Such instructions as to the positioning of the loading equipment and the trucks and the point within the truck where the loading is to commence, obviously pertain to *details and specific methodology in performing the work,* not simply to the end result, and point conclusively to Simplot's right of control.

The majority's statement that such evidence merely relates to the final product, is simply not persuasive. To accept it requires a greater leap of faith than I am able to make. If this evidence does not constitute control over the details, manner, method or means of performing the work,

then it is difficult to fathom what set of circumstances will satisfy the majority. Seldom is there such well-established, "black and white" evidence showing control over the details and manner of performing the work as exists in this case. Such control over the details, method, manner, and means of performing the work does not lose its significance simply because it ultimately affects the end result. The majority's conclusion is in direct contradiction to facts found, which findings of fact are more than substantial. I would therefore affirm the Industrial Commission.

### III.

The majority's decision will also be disturbing to the Department in that the substantial and competent evidence test, ordinarily so religiously resorted to by those who compromise today's majority, is simply ignored in a fashion most cavalier. If that standard of review has been mentioned at all, then I am remiss in my reading ability. Thus, "that which has in the past been impenetrable of review is proven to be not so impenetrable after all." *Tendoy Area Council v. Department of State*, 108 Idaho 441, 443, 700 P.2d 63, 65 (1985) (Bistline, J., dissenting). The Department may well suspect a result-oriented bent in today's opinion for the Court to the detriment of the workers of the state, and all in violation of the declared purpose of Idaho's unemployment laws, "which is to alleviate the hardship caused by unemployment which was not caused by any fault on the employee's part. *Smith v. Department of Employment*, 100 Idaho 520, 521, 602 P.2d 18, 19 (1979)." *Id.* I therefore dissent.

HUNTLEY, Justice, dissenting.

I concur in the dissent of Justice Bistline and would add several comments.

The majority opinion appears to be result-oriented, reaching its result of reversal only by ignoring several controlling facts which support the ruling of the Industrial Commission. Then the majority, seizing on the facts which it wishes to emphasize (while ignoring the others) takes over the fact-finding function of the commission.

When one cuts through the facade of legalisms, we have a circumstance where a major Idaho employer is using a subterfuge to deny workers benefits to which the law entitles them.

Exhibit 22 (Appendix A hereto) establishes that Simplot, to save himself $4.90, $21.10, or $13.10 per load of potatoes (depending upon distance from plant to warehouse) and $216.00 in employee benefits, deprives these men not only of unemployment compensation but also workers compensation and health and accident insurance.

It is argued that Alonzo Maldonado knew what he was doing and contracted at arms-length when he signed. Anyone who believes that should note the last page of the "Independent Contractor Agreement-Hoggers" which is photocopied herein:

5. Nothing contained herein obligates Simplot to provide contractor with a minimum amount of work. Simplot has the right at its sole discretion to cancel this agreement and its obligations hereunder at any time, with or without prior notice, without liability whatsoever beyond its obligation to pay for work performed to date.

CONTRACTOR

By *ALONZO MALDONADO*

J.R. SIMPLOT COMPANY

By _____

Its

Not only did Alonzo misspell his own last name, when he printed (not signed) the agreement, but the paragraph 5 above his signature is a "jewel" which indicates the true nature of the sham which this court now endorses.

In *Larsen v. State of Idaho, Department of Employment*, 106 Idaho 382, 679 P.2d 659, this Court stated:

We uphold the Commission finding that appellant Larsen did not meet the requirement of subpart (B), i.e., show that the sprinkler pipe movers were "engaged in an independently established trade, occupation, profession or business." Accordingly, we do not need to reach the question of "control or direction" presented by subpart (A).

 The requirement of subpart (B) that the worker be engaged in an independent trade or business has been held to involve consideration of a number of factors: whether the worker owns major items of equipment; *whether either party would be liable to the other for peremptory termination of the business relationship* (These three considerations were enumerated in *Swayne v. Department of Employment*, 93 Idaho 101, 456 P.2d 268 (1969), and have been restated in subsequent decisions; *see e.g., Totusek v. Department of Employment*, 96 Idaho 699, 535 P.2d 672 (1975); *see also Hammond v. Department of Employment*, 94 Idaho 66, 480 p.2d 912 (1971) (holding that no one factor of the three is conclusive)). In *Department of Employment v. Brown Brothers Const.*, 100 Idaho 479, 600 P.2d 783 (1979), we pointed out that the tests set out in *Swayne* were not the only applicable criteria for determining the nature of the working relationship. Id. at 482, 600 P.2d at 786. In fact, since the determination of whether the worker is "engaged in an independently established trade, occupation, profession or business" is "one which must be determined from all the facts and circumstances of the individual case," *National Trailer Convoy, Inc. v. Employment Security Agency*, 83 Idaho 247, 251, 360 P.2d 994, 996 (1961), there must necessarily be taken into consideration a number of factors, depending upon the circumstances of each case. In *National Trailer* this Court set out several relevant factors, where they may be determined:

" 'Among the factors to be considered are whether the contractor is carrying on an independent business; whether the work is part of the employer's general business; the nature and extent of the work; the skill required; the term and duration of the relationship; the right to assign the performance of the work to another; *the power to terminate the relationship;* the existence of a contract for the performance of a specified piece of work; the control and supervision of the work; the employer's powers and duties with respect to the hiring, firing and payment of the contractor's servants; the control of the premises, tools, appliances, material, and labor; and the mode, manner, and terms of payment. Ordinarily no one feature of the relationship is determinative, and all are taken into consideration in determining whether or not a person is an independent contractor.' " 83 Idaho at 252, 360 P.2d at 997.

*Because it is for the factfinder to determine whether the worker has the status of an independent contractor* (except in "the clearest of cases," *Fitzen v. Cream Top Dairy*, 73 Idaho 210, 124, 249 P.2d 806, 809 (1952)), we look to the record to determine if the decision of the Industrial Commission is supported by substantial and competent evidence. We hold that it is. (Emphasis added). Id. at 383–84, 679 P.2d at 660–66.

In other words, the holding of *Larsen* and all the other cases therein cited is that the right to terminate at will without the employer becoming exposed to liability for wrongful termination of a contract is indic-

ative of *employee* status. That right of termination "without liability whatsoever" is expressly provided in paragraph 5 of the subject contract.

Note that in *Larsen, supra,* we allowed the commission to be the factfinder.

Our courts and our legal system should perhaps be mindful of the common good resulting from a system of laws which enables the "captains of industry," to make money, invest, and create jobs—one wonders if it is not possible to attain those goals without depriving the labor force of workmen's compensation, unemployment compensation, and health and accident benefits.

Here the Industrial Commission ended its decision with the following Conclusion of Law which is correct and sustainable in all respects:

## VII

No one test standing alone, except the right to control in the relationship of employee and employer and the lack of such right in that of principal and independent contractor, is wholly decisive. *Geutler [Beutler] v. McGregor Triangle Company,* 85 Idaho 415 [380 P.2d 1]. The Referee concludes that Simplot has retained the right to control or direct the contract loaders in the performance of their work under their contract of service and in fact. The contract loaders are not independently established. The services performed by the contract loaders are in employment covered by the Employment Security Law. The Referee recommends that the Commission affirm the decision of the Appeals Examiner by entering the following order.

BISTLINE, J., concurs.

BISTLINE, Justice, concurring specially in the dissenting opinion of HUNTLEY, Justice.

Having concurred in the opinion of Justice Huntley—which was written independently of my own opinion, I write additionally to enlarge upon the facial invalidity of the so-called "contract" as constituting a genuine contractual agreement by which Alonzo Maldonado is claimed to have achieved the status of an independent contractor. After receiving Justice Huntley's opinion, the specially concurring of Bakes, J., was received, and it is also deserving of some attention, either directly or indirectly. What I am able to make of what Bakes, J., writes is his bare allegation that "the decision of the Commission again fails to give the parties' contract the consideration it warrants." Just what consideration this particular "contract" warrants is what this case is all about, and was determined after a hearing and consideration of all the evidence and the "contract" itself. Justice Huntley photocopied a portion of the "contract," paragraph 5 to be exact, and the signatures of the "Contractor" and the person executing the document for J.R. Simplot Company. Earlier I had contemplated displaying the entire document, and now do so by supplying a photocopy of the first page which provides the first four paragraphs—together with the attachment referred to in paragraphs 1 and 2. *See* Attachment A.

In applying Justice Bakes' theory of giving the contract "the consideration it warrants," surely Justice Bakes, as with myself, had to be concerned with paragraph 3 and its remarkable provisions—concerning which one would think comment to another trained legal mind would be wholly superfluous. But, nevertheless, one should take note that both Mr. Maldonado and the Simplot Company recognized "actual and potential risks and hazards involved at the work site" (which is wholly undefined or unexplained in the document), and then that Mr. Maldonado, because he is a contractor and not an employee, "accepts full responsibility therefore."

But notwithstanding that, Simplot goes even further and extracts Mr. Maldonado's agreement that he is obligated to indemnify, defend, and save harmless Simplot, but not just Simplot, but all of its agents, officers, affiliates, subsidiaries, and employees against any suits, actions, claims, demands, liens, losses, damage and expenses in connection with Mr. Maldonado's activities hereunder (even including reasonable attorney's fees), for or on the violation of any statute, ordinance or regulation, or for personal injury or death of any person(s) including but not limited to workmen, or damage of any nature to any property which may arise out of Maldonado's work or operations. That is one heap of liability to impose on anyone. It reads well, and has all of the earmarks of two large corporate entities dealing with each other—one an independent contractor who is going to undertake the completion of a project for the other—such as the independent contractors which Justice Shepard mentioned at oral argument who take on state highway projects. Here, however, Mr. Maldonado is not a corporate entity, but a laborer possessed of certain skills learned in the potato industry.

This paragraph 5 language alone, absent anything else, is enough to raise a *prima facie* case that someone not too skilled in draftsmanship or learned in the law was asked to come up with an agreement that would give the appearance of creating an independent contractor and principal relationship out of what had been an employer-employee relationship. The Industrial Commission and the Department of Employment have seen such shams before, but probably not one as patent as paragraph 5 reveals this to be.

And, if one were to indulge in the fantasy that Mr. Maldonado did "intend" (to use the language of Justice Bakes) to become carte blanche indemnitor to and for Simplot, including all of its agents, officers, subsidiaries, and affiliates—just how Mr. Maldonado would take care of any personal injury judgments, for instance, is up for wild speculation. All that we do know is that—unlike a true agreement involving an independent contractor and an indemnity provision—here there is no requirement of Mr. Maldonado that he obtain a liability policy affording to Simplot, and whole host of *et al*'s, the actual financial protection which paragraph 5 requires of Mr. Maldonado. The entire proposition is so absurd that most interested readers will wonder why Justice Bakes has written separately to bolster the opinion authored by Justice Shepard.

But that is not all! There is more yet to be said on just a facial examination of the "contract." There is paragraph 4 to consider in "giving the parties' contract the consideration it warrants." What does this paragraph do? It makes Mr. Maldonado responsible for paying himself and his one helper—which I do believe is gleanable from the sentence Mr. Maldonado "shall be solely and personally liable for all labor expenses...." That sentence is sandwiched in between the first and last sentences—both of which are alike in substance and amount to no more than disclaimers of any—perish the thought—relationship of employer-employee. Certainly paragraph 4, other than placing responsibility on Mr. Maldonado to pay himself (and his crew of one more) out of funds received from the Company is not one of the *mutual convenants* or *considerations* referred to in the preamble of the questioned document. And, there, together with paragraph 5 above discussed by Justice Huntley, is the "contract" by which Mr. Maldonado, the somewhat skilled farm worker, is said to have departed the ranks of the employed.

Paragraphs 1 and 2 have not been overlooked. The first only serves to reference to Attachment B and the second to Attachment C. Justice Huntley has dealt with the second. My efforts have been focused

on the first, which, for openers, has the strange heading of "CORPORATE MAINTENANCE & TRUCKING" and concludes at the bottom of this single page with this rather strong caveat, one which implicitly suggests that it be followed, or out you go: "IT HAS COME TO OUR ATTENTION THAT SOME RULES REGARDING LOADING PROCEDURES ARE BEING BROKEN. IT IS IMPERATIVE THAT *ALL* RULES ARE FOLLOWED. NO EXCEPTIONS!!" Rules, of course, are for employees. Contractual provisions between principals and independent contractors seldom, if ever, come under the nomenclature of rules. All of which suggests rather strongly that, independent contractor or not, Mr. Maldonado was being told in twelve paragraphs exactly *what* to do and *how* to do it. Outside of the list of twelve rules, Mr. Maldonado was also told *when* to do it. It would seem that this degree of control alone might have ended all controversy.

But, if more is needed to divert the majority from what may be a prechosen course, it becomes interesting to look into the history of the transition from employee into that of independent contractor. In proceedings before the Commission, the only witnesses were those called by Simplot—two in number, one of whom was Mr. Jerry Davis, fleet manager for J.R. Simplot Company, Trucking Center. He had also testified at the last hearing in Department administrative proceedings before the appeals examiner, Mr. Pipkin.

Responsive to a question, he provided the following history of the transition:

In 1959, '60, '65, when they started storing potatoes, they used forking crews at that time; people used forks to load these. And they did it, at that time, so much per load. Okay. As modern things come, and on and on, they invented a loader and a piler, and things of that nature. Well, Simplot, in order to store the potatoes, also used the piler that was different. And so consequently, as time

went on, and they did invent this loader that we're talking about, or whatever, they already had the piler equipment and the tractor equipment. So I guess the loader equipment was just added to it and continued right on, really with the forking crews, taking over at that time, going into the contract loading. Tr., p. 26.

Although the specific question was not asked concerning the document promulgated by "CORPORATION MAINTENANCE & TRUCKING," the impression to be gathered is that it did in fact govern employees in the early years, and was carried on into the contract which was intended to serve the purpose of converting the involved potato moving employees into independent contractors.

In a letter from Simplot's corporate headquarters in Boise to the Department, under date of September 21, 1983, mention was made of Simplot's trucking center in Caldwell, and the inference is clearly permissible that the rules which govern the loaders were promulgated there. That letter, Exhibit No. 11, reads as pertinent:

The Contract Loader Operators which are the subject of this concern coordinate their activities with J.R. Simplot Company's Trucking Center located in Caldwell, Idaho and are paid by J.R. Simplot Company, Food Division, Caldwell, Idaho. Exhibit 11, p. 1.

The same letter establishes as well that Simplot unilaterally decided to make the conversion of some employees into independent contractors, and touches also on Simplot's protection in case of third-party injury, or "contractor" industrial injury.

1. In 1973, Simplot purchased sufficient loaders, pilers and farm tractors which are the items of heavy equipment needed for this work. Initially the work was done by J.R. Simplot Company Caldwell employees, but due to prohibitive transportation and living costs necessarily incurred in conjunction with the work which is done in storage facilities often-

times far from home, and also due to the practical inability to supervise or control employees, Simplot decided to establish an independent contractor arrangement.

. . . .

3. No bids are solicited. Instead, Simplot unilaterally publishes an itemization of the price that will be paid per truck load of potatoes loaded. The prices fluctuate depending on location of the particular storage facility.

. . . .

In exchange for an agreed upon price per load, the Contract Loader Operators are required to load potatoes in semi-trailers by using company owned heavy equipment and their own personal tools to maintain the equipment, to be at specified cellar locations, to coordinate the loading activities with the semi-trailers in accordance with Simplot's scheduling, and to generally manage the storage locations during the loading. Exhibit No. 11, pp. 2–3.

Presumably the Contract Loader Operator would carry liability insurance covering his activities on the job site. Simplot does maintain extensive liability insurance which would protect Simplot to the extent of Simplot's exposure resulting from activities engaged in by anyone, including independent contractors; however, there is no specific coverage insuring the Contract Loader Operators. Simplot's insurance would also provide protection in the event of any injury to person or property of any third party, including Contractor Loader Operators, legally caused by Simplot. Exhibit No. 11, p. 5.

3. ... Presumably the Contract Loader Operator would maintain his own liability health, accident and/or worker's compensation insurance, but Simplot is not privy to this information. As protection in the event of a Contract Loader Operator's failure to provide worker's compensation coverage, Simplot maintains a worker's compensation policy covering Simplot's exposure on all of its independent contracts, including those that involve Contract Loader Operators. Exhibit No. 11, p. 7.

ATTACHMENT A

INDEPENDENT CONTRACTOR AGREEMENT-HOGGERS

This Agreement made and entered into by and between J.R. Simplot Company, of *Alonzo Maldonado Heyburn, Ida* California (hereinafter "Simplot") and *Alonzo Maldonado* of *Hazelton Idaho*, (hereinafter "Contractor").

W I T N E S S E T H

In consideration of the mutual covenants and considerations hereinafter set forth, the parties hereto agree as follows:

1. Contractor shall perform certain services for Simplot, as follows:

SEE ATTACHED

2. In consideration for the performance of said services, Simplot shall pay contractor at the following rate, within 15 days of its receipt of monthly invoices itemizing said services:

SEE ATTACHED

3. Contractor acknowledges and agrees that it has been fully advised by Simplot as to all actual and potential risks and hazards involved at the work site, that contractor fully understands the same and accepts full responsibility therefor. Contractor shall indemnify, defend and save Simplot, its agents, officers, affiliates, subsidiaries, and employees, harmless against any suits, actions, claims, demands, liens, losses, damage and expenses in connection with contractor's activities hereunder, including reasonable attorney's fees, for or on the violation of any statute, ordinance or regulation, or for personal injury or death of any person or persons, including, but not limited to workmen, or damage of any nature to any property which may arise out of the work or operations carried out by the contractor in conjuction with his agreement.

4. Contractor shall perform the contract as an independent contractor and nothing contained herein shall be construed to be inconsistent with this relationship or status. Contractor shall be solely and personally liable for all labor expenses, obligations and other expenses in conduction with said contract. Nothing contained herein shall be construed to create an employer/employee relationship between Simplot and contractor or any employee or agent of the contractor.

ATTACHMENT B

### CORPORATE MAINTENANCE & TRUCKING
### CALDWELL, IDAHO

**PROCEDURES FOR POTATO LOADING CREWS:**

1. There will be two people in cellar at all times, one to run the hog and the other to clean up cellar and maintain equipment. The crew shall be at the cellar 30 minutes prior to loading time; to set up equipment and be ready to go by loading time.

2. Dirt will be continually cleaned up under draper chain, either manually or with tractor, so it never builds up into the chain.

3. Crew will see that no trucks run over any electrical cords at any time.

4. Machinery will be properly greased and oiled at all times.

5. Crew will help truck drivers back into cellars; a flashlight will be used for visability.

6. There will be no loading over the side of trucks. The boom will be in back of the truck as low as possible and tail boards will be removed.

7. No children will be allowed in loading area, including those of truck drivers. <u>No animals allowed in cellars.</u>

8. Belly-dump trucks should be loaded with turned-down nose pilers only.

9. Belly-dump trucks that have to be loaded over the side will be positioned so that the loading is started in the corner of the trailer, to allow the boom as low in the truck as possible.

10. Potatoes will be cleaned up around the piler and hog at all times. It is the responsibility of the truck driver to see that all potatoes spilled by him, are picked up.

11. At crew change, all equipment will be cleaned and greased and cellar cleaned. The crew leaving will inform new crew of any equipment problems or foreseeable problems.

12. Permission must be obtained before hooking up private travel trailers to lights or water at the cellars. Get permission from Simplot representative or owner of the cellar.
At No time shall trailers or vehicles be parked in cellars.

IT HAS COME TO OUR ATTENTION THAT SOME RULES REGARDING LOADING PROCEDURES ARE BEING BROKEN. IT IS IMPERATIVE THAT ALL RULES ARE FOLLOWED. NO EXCEPTIONS!!

ATTACHMENT C

| | 10 WHEELERS 24 | SEMI'S 12 or More | SEMI'S 11 or Less |
|---|---|---|---|
| 0 – 25 MILES | $ 8.00 | $14.00 | $15.00 |
| 25 – 45 MILES | $ 9.00 | $15.00 | $16.00 |
| 45 – 60 MILES | $10.00 | $16.00 | $17.00 |
| 60 – 80 MILES | $11.00 | $18.00 | $20.00 |
| Over 80 MILES | $——— | $20.00 | $22.00 |