841 P.2d 420

**VENDX MARKETING COMPANY, INC., Employer Account # 0001313271, Claimant–Appellant,**

v.

**DEPARTMENT OF EMPLOYMENT, Defendant–Respondent.**

**No. 19470.**

Supreme Court of Idaho, Pocatello, May 1992 Term.

Nov. 4, 1992.

Hopkins, French, Crockett, Springer & Hoopes, Idaho Falls, for claimant-appellant. Lary S. Larson, argued.

Larry EchoHawk, Atty. Gen., John C. Hummel, Deputy Atty. Gen., argued, Boise, for defendant-respondent.

CAREY, Justice Pro Tem.

Vendx Marketing, Inc., has appealed the decision of the Industrial Commission of the State of Idaho affirming a determination that services performed by Vendx sales representatives came within the scope of employment covered by unemployment compensation and that commissions paid by Vendx to its sales representatives were wages for employment security fund contribution purposes. The order of the Industrial Commission is vacated and is remanded to the Industrial Commission because of its failure to consider the plain language of the agreements between Vendx and its sales representatives.

## FACTUAL AND PROCEDURAL BACKGROUND

The Idaho Department of Employment conducted an audit of the activities of

Vendx from the third quarter of 1986 through the second quarter of 1988 and determined that it had failed to pay approximately $16,000 in contributions to the employment security fund for wages paid to sales representatives between October 1986 and June 1988. Vendx appealed the determination, claiming that its sales representatives were not engaged in covered employment.

According to evidence presented at a hearing before a Departmental Appeals Examiner, Vendx is an Idaho Corporation located in Idaho Falls that sells candy vending machines nationwide. Since its founding in 1986, Vendx has contracted for the services of experienced sales representatives. When Vendx first started business, and prior to the dates in issue, it paid sales representatives by commission and reimbursed their expenses. After a few months, the payment structure was changed to straight commission without expense reimbursement. Sales representatives never have been paid salaries or guarantees, but only commissions on completed sales. Some sales representatives received up to $200,000.00 per year in gross commissions.

For a short period, when Vendx was changing product lines and did not have a product to deliver, sales representatives were offered $500.00 per week to cover expenses. This offer was made so sales representatives would attempt to make sales for future delivery and so that the company would not lose its sales force. Although the offer was made, it does not appear that any sales representative actually received payment under the plan.

Sales representatives received no bonuses, vacation pay, sick leave, or other benefits. Vendx made unsecured loans and advances on future commissions to its sales representatives, which they were required to repay. Upon termination of agreements, Vendx permitted sales representatives to complete sales in progress and paid commissions for those sales.

Vendx carried no workers compensation insurance for its sales representatives. Vendx reported commissions to the IRS on 1099 forms rather than W-2 forms. Vendx did not deduct state or federal withholding or social security taxes from commissions paid.

During the audit period, Vendx had written agreements in force with its sales representatives. There were two types of form agreements, one of which was used prior to October 1987 and the other of which was used after October 1987. The form agreements were drafted by Vendx. While the agreements generally were not subject to negotiation, there were instances in which individual sales representatives were able to bargain for better terms.

The earlier contract, a two-page form dating from September 1986, appears from its structure, grammar, spelling, and content to have been prepared in haste by a non-attorney. Under the terms of the form, sales representatives agreed to sell Vendx's services and programs throughout the United States, and Vendx agreed to pay commissions for sales, including sales completed after termination. Vendx retained contractual control over assignment of territories, approval of financing offered to prospective purchasers, and approval of sales at less than list price. Sales representatives agreed to pay their own expenses and to reimburse Vendx for advances. Parties were free to terminate the agreements without cause. In two separate places, sales representatives were designated as "independent contractors."

One former sales representative testified that he had no written contract at the start of his relationship with Vendx. On September 4, 1986, he attended a meeting at which existing sales representatives were presented with copies of the two-page form agreement to sign. During the meeting, the president of Vendx told them, "Look, for tax purposes, we need to have you guys sign this agreement, if you're going to continue to work with us. But I want you to know that, even though this is for tax purposes, but we can, basically, still tell you what you need to do and what you're supposed to do." (Transcript, p. 269, lines 5–10).

The second contract is a more sophisticated form. It was presented to existing sales representatives at a meeting held on October 29, 1987. Under its terms sales representatives were appointed as "independent contractors" to "sell, promote, and assist in the distribution" of Vendx's products. Vendx agreed to pay a commission for completed sales and to supply catalogs, price lists, product samples, advertising, and promotional materials. Sales representatives were required to devote their "entire time and best efforts" to selling Vendx's products; to place orders only on Vendx's forms; to use only Vendx's catalogs, price lists, and promotional literature; to adhere to all laws and ethical standards; to collect and forward executed orders and down payments to Vendx; to attend and participate in "Business Opportunity Shows" at Vendx's request; and to provide and pay for their own transportation, hotel, telephone, mail, clothing, and automobile insurance expenses. Sales representatives were prohibited from accepting orders on behalf of Vendx; making settlements or collecting payments other than down payments; using unauthorized catalogs, price lists, promotional literature or forms; using Vendx's name on stationery, documents, or advertising without permission; placing advertisements without permission; selling non-Vendx products at business opportunity shows; directly or indirectly marketing competing products; and representing to customers that sales representatives or Vendx would provide locations for vending machines. Vendx retained the right to assign and change territories, to fix or change prices and terms of sales, and to accept or reject orders.

The form also had a section entitled "INDEPENDENT CONTRACTOR STATUS." It read:

The parties intend and agree that Salesman is an independent contractor and not an agent or employee of Vendx. Vendx is interested only in the results obtained under this contract. The manner and means of handling sales shall be under the sole control of Salesman except as otherwise provided herein. Salesman shall adhere to all laws and ethical standards applicable to salespersons and shall perform in a manner consistent with generally accepted procedures for that profession. None of the benefits provided by Vendx to employees, including, but not limited to, Workmen's Compensation Insurance and Unemployment Insurance are available from Vendx to Salesman. Salesman shall be responsible to pay his own Social Security, Self-employment tax, and all estimated Federal and State Income Taxes on a timely basis. Failure to do so shall constitute default. Vendx shall have no obligation or liability for any such payments. Further, employee is not entitled to benefits under Minimum Wage or pre-paid health insurance laws, or laws governing pension plans, or any laws applying to normal employer-employee relationships. Salesman agrees to and shall indemnify and forever hold Vendx harmless from any such claims either by Salesman, Salesman's representatives, heirs, personal representatives, or successors in interest.

The contract period was for one year with successive one-year renewals, subject to the right of both parties to terminate the agreement by mutual consent, the right of either party to terminate the agreement on thirty days' notice, and the right of Vendx to terminate the agreement for cause. Finally, the form contained non-competition, intellectual property, confidentiality, and indemnification clauses.

For the most part, the terms contained in the 1987 contract form were carried out in practice, but exceptions, changes, and amplifications were made from time to time.

In day-to-day operations, Vendx did not provide its sales representatives with offices or supplies other than sales forms, brochures, and business cards. However, it did allow sales representatives to use its office space to complete paperwork. Some of the sales representatives maintained offices in their own homes or other places of business.

Vendx supplied sales representatives with training in areas of product features,

product knowledge, and product orientation. It also provided suggested sales presentations and training in completing sales contracts and related forms. Vendx attempted to control the statements made by its sales representatives about characteristics of the products and terms of sales agreements in order to avoid violations of law and liability to third parties. Vendx set minimum prices at which its products could be sold. Sales agreements were not effective until approved by Vendx.

Vendx sometimes assigned territories to sales representatives, but more typically sales representatives attended trade shows and business opportunity shows throughout the United States. In consultation with individual sales representatives, Vendx scheduled who would attend particular shows. Vendx paid for and supplied show space, pre-fabricated booths, and demonstrator machines, along with flip charts, brochures, advertising, and form sales contracts. Vendx permitted sales representatives to hire temporary assistants for individual shows. If Vendx authorized a temporary hire, it reimbursed the sales representative.

Trade and opportunity shows were major sources of sales leads. Shows ordinarily were held on Saturdays and Sundays. Weekdays were occupied by following up personal contacts made at shows. Most sales representatives participated in shows at Vendx's request but were not absolutely required to do so. Several former sales representatives, however, testified that they were led to believe they would be terminated if they regularly refused to attend shows. The 1987 contract gave Vendx the right to require sales representatives to attend shows, and all sales representatives that are the subject of this controversy regularly attended shows.

While Vendx managerial employees often were present at shows, they did not direct the efforts of the sales representatives who had previous show experience. When new sales representatives attended shows for the first time, they were given on-site training. Duties of sales representatives at the shows included setting up and dismantling booths, distributing literature, and promoting the sale of products.

Vendx generally did not order sales representatives to contact specific leads, to attend specific shows, or to follow specific sales routines. It did provide sales representatives with additional leads that resulted from advertising rather than shows.

Sales representatives determined what hours they worked. They usually reported regularly by telephone to the home office on their progress and activities. They traveled up to four or five weeks at a time. They paid their own travel, meal, telephone, entertainment, and lodging expenses. Expenses for sales representatives were substantial. One former sales representative testified that his expenses averaged $1,000.00 per week when he was on the road. Sales representatives also paid for supplies not provided by Vendx and occasionally for additional advertising. Some sales representatives shared expenses and commissions among themselves.

All the sales representatives who testified at the hearing, including those testifying on behalf of the Department of Employment, considered themselves to be "professional" salespeople. While certain types of sales people, such as insurance agents, real estate sales people, and hearing aid dealers, must be licensed under Idaho law, it does not appear that professional sales people in general are required to be licensed or to belong to an organized professional association. Compare, I.C. §§ 41–1030, 54–2045, 54–2902.

The sales representatives who testified also considered themselves to be independent contractors. Nevertheless, they made their presentations to customers in the name of Vendx, rather than in their own names or in other assumed business names.

Sales representatives sometimes carried on additional businesses while under contract to Vendx. The businesses included farming, insurance, retail sales, and vending machine sales for competing distributors. Vendx did not object to any outside business except sale of competing products.

Based on the evidence presented at the hearing, the Appeals Examiner entered findings of fact and conclusions of law in which she decided that the sales representatives were not free from control or direction of Vendx in fact and under the terms of the contracts, and that the sales representatives were not engaged in independently established professions, trades, occupations or businesses. Consequently their services constituted covered employment, and payments to them by Vendx were wages for purposes of required contributions to the employment security fund. I.C. §§ 72–1316(d), 72–1328. In reaching her decision, the examiner stated that although Vendx and its sales representatives considered "the relationship to be that of an independent contractor, the Examiner does not find that intent expressed in the provisions of the contract between the parties." (Decision of Appeals Examiner, p. 6).

Vendx appealed the decision to the Industrial Commission. During the pendency of the appeal, the parties agreed that the decision applied only to "regional directors and sales personnel" of Vendx who performed services within Idaho, whose services were localized in Idaho, or who resided in Idaho at the time of service.

The Industrial Commission conducted a *de novo* review of the record. It entered an order concurring in the findings of fact and conclusions of law of the Appeals Examiner and adopting her decision as the decision of the Industrial Commission. I.C. § 72–1368(g); *In Re Guajardo*, 119 Idaho 639, 809 P.2d 500 (1991).

Vendx has appealed to this Court, asserting that the Commission's findings that its sales representatives were not free from control or direction in the performance of their work and that its sales representatives were not engaged in independently established trades or businesses are not supported by substantial and competent evidence. Vendx also argues that the finding that its sales representatives were engaged

in covered employment is contrary to the intent and purpose of the Employment Security Law. Because the case will be remanded for further consideration of the evidence, resolution of the second issue is premature.

### SCOPE OF REVIEW

■ This Court's review of decisions of the Industrial Commission is limited to questions of law. Review in cases involving factual disputes is limited to determining whether findings of fact by the Commission are supported by substantial and competent evidence in the record. The Court will not independently adopt findings at variance with those of the Commission if the findings are supported by substantial and competent evidence in the record. Idaho Constitution, art. 5, § 9; *Spruell v. Allied Meadows Corp.*, 117 Idaho 277, 787 P.2d 263 (1990).

### SUFFICIENCY OF THE EVIDENCE

Vendx concedes that it was a covered employer, required to make contributions to the employment security fund for certain of its employees. It argues, however, that services performed by its sales representatives during the audit period were not covered employment for the purpose of computing its required contribution.

■ The Employment Security Law is remedial social legislation rather than revenue producing legislation. "Covered Employment" is an expansive term, and statutory exemptions from covered employment are to be narrowly construed. *John L. King, P.A., v. Dept. of Employment*, 110 Idaho 312, 715 P.2d 982 (1986). It is defined as "an individual's entire service, including service in interstate commerce, performed by him for wages or under any contract of hire, written or oral, express or implied." I.C. § 72–1316(a). "Wages" means "all remuneration for personal services from whatever source, including commissions ..." I.C. § 72–1328(a).[1] Services performed by an individual for remuneration come within the definition of covered employment:

---

1. I.C. §§ 72–1316 and 72–1328 were amended after the audit period. The amendments did not change the substance of the applicable language in the statutes. S.L.1989, ch. 57, § 2, p. 78; S.L.1991, ch. 67, § 1, p. 162.

(1) Unless it is shown:

(A) That the worker has been and will continue to be free from control or direction in the performance of his work, both under his contract of service and in fact, and

(B) That the worker is engaged in an independently established trade, occupation, profession, or business; I.C. § 72–1316(d)(1).

■ In determining whether a worker is free from control or direction in the performance of his work, the test is not whether the putative employer has control over the end result of the services but whether control "... extends to the details of the work, the manner, method or mode of doing it, the means by which it is to be accomplished, or, specifically, the details, manner, means, or method of doing the work, as contrasted with the result thereof." *Dept. of Employment v. Bake Young Realty,* 98 Idaho 182, 184, 560 P.2d 504 (1977); *J.R. Simplot Co. v. Dept. of Employment,* 110 Idaho 762, 718 P.2d 1200 (1986). In determining whether a worker is engaged in an independent trade or business, the factors to be considered include:

1. Whether the worker has authority to hire subordinates;

2. Whether the worker owns major items of equipment or incurs substantial unreimbursed expenses.

■ Although a factor of substantially less significance, the Commission also may consider whether either party would be liable to the other upon peremptory or unilateral termination of the business relationship. *J.R. Simplot v. Dept. of Employment, supra.* None of the foregoing factors is an absolute prerequisite to finding that the worker is engaged in an independent trade or business; nor do they represent an exhaustive list of possible factors to be considered. Other factors may include, for example:

1. Skills, qualifications, and training required for the job;

2. Methods of payment, benefits, and tax withholding;

3. Right to negotiate agreements with other workers;

4. Right to chose sales techniques or other business techniques;

5. Right to determine hours;

6. Existence of outside businesses or occupations;

7. Special licensing or regulatory requirements for performance of work.

*See, e.g., John L. King, P.A., v. Dept. of Employment, supra; Larsen v. Dept. of Employment,* 106 Idaho 382, 679 P.2d 659 (1984); *Dept. of Employment v. Bake Young Realty, supra.*

■ Although covered employment may include independent contractors, the status of a worker as an independent contractor is a factor to be considered. *Compare, Swayne v. Dept. of Employment,* 93 Idaho 101, 456 P.2d 268 (1969); *John L. King, P.A., v. Dept. of Employment, supra; Software Associates v. Dept. of Employment,* 110 Idaho 315, 715 P.2d 985 (1986); *Dept. of Employment v. Bake Young Realty, supra.* The question of status as an independent contractor is a question of fact. *Larsen v. Dept. of Employment, supra.*

■ The Commission adopted a finding that there was no intent "expressed in the provisions of the contract between the parties" that Vendx's sales representatives had the status of independent contractors. The finding is contrary to the undisputed evidence. Every witness, whether appearing for Vendx or for the Department, testified to the status of all the sales representatives as independent contractors. Both of the contract forms referred to sales representatives as independent contractors. The 1987 contract form spelled out the independent contractor status of sales representatives in great detail.

Neither the Department of Employment nor the Industrial Commission can dispose of contractual provisions for independent contractor status simply by ignoring them. *J.R. Simplot v. Dept. of Employment, supra* (Bakes, J., concurring specially). While the agreements of the parties constituted only one of the many factors to be considered, the Industrial Commission's decision failed to give the relevant contractual provisions any consideration whatsoever.

The order of the Industrial Commission, therefore, is vacated and the case is remanded to make new findings after reviewing *all* of the evidence, including the undisputed agreements of the parties. Costs to appellant.

BAKES, C.J., and BISTLINE and McDEVITT, JJ., concur.

JOHNSON, Justice, dissenting.

I dissent from the Court's opinion. In my view, the opinion conflicts with the opinion of the Court in *Darner v. Southeast Idaho In–Home Services,* 122 Idaho 897, 841 P.2d 427, issued concurrently with the opinion in this case. In *Darner,* after rejecting one of the evidentiary grounds for the Commission's decision, the Court considers alternative evidence for upholding the Commission's decision under the substantial and competent evidence standard. In this case, after rejecting one of the evidentiary grounds for the Commission's decision, the Court vacates the Commission's decision, even though there is other substantial and competent evidence to support the Commission's decision. I am unable to accept this lack of consistency. Therefore, I dissent in this case, and concur in the result in *Darner.*